## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

| | |
|---|---|
| JOHNNY MAGEE, individually and on behalf of all other similarly situated, | |
| Plaintiff, | Case No.  3:25-cv-94-CWR-LGI |
| v. | |
| PRIORITYONE BANK, | Jury Trial Demanded |
| Defendant. | |

## CLASS ACTION COMPLAINT

Plaintiff Johnny Magee, individually and on behalf of the classes of persons preliminarily defined below (the "Classes"), makes the following allegations based upon information and belief, except as to allegations specifically pertaining to Plaintiff, which are based on personal knowledge.

## NATURE OF THE ACTION

1.      Plaintiff brings this action individually and on behalf of Classes of all similarly situated consumers against Defendant PriorityOne Bank ("Defendant") over the improper assessment and collection of (1) $38.00 overdraft fees ("OD Fees") on accounts on days when the account was not actually overdrawn; (2) $38.00 OD Fees on transactions authorized on sufficient funds; (3) $38.00 OD Fees on another fee, not a consumer-initiated item or transaction; (4) multiple $38.00 fees on an item that the consumer only presented for payment once; and (5) the assessment of overdraft interest charges on days when the account balance is not overdrawn.

1

2.      These practices breach promises made in Defendant's adhesion contract, which includes, upon information and belief, the Overdraft Opt-In Form,[1] attached hereto as **Exhibit A**, and the Fee Schedule, attached hereto as **Exhibit B,** (collectively, the "Contract").

3.      Plaintiff and other customers of Defendant have been injured by Defendant's improper fee maximization practices.   Plaintiff, individually and on behalf of the classes of individuals preliminarily defined below, brings claims for Defendant's breach of contract, including the duty of good faith and fair dealing, and unjust enrichment.

## PARTIES

4.      Plaintiff is a citizen of Mississippi and a resident of Collins, Mississippi, in this District. Plaintiff has maintained a checking account with Defendant at all times relevant hereto.

5.      Defendant is a citizen of Mississippi and maintains its principal place of business in this District in Magee, Mississippi. It has more than $1.1 billion in assets and maintains branches throughout Mississippi. Defendant is engaged in the business of providing retail banking services to consumers, including Plaintiff and members of the Classes, in this District.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2), because the matter in controversy exceeds $5,000,000, exclusive of interest and costs, and is a class action in which at least one member of the class is a citizen of a State different from the Defendant. The number of members of the proposed Classes in aggregate exceeds 100 accountholders. 28 U.S.C. § 1332(d)(5)(B).

---

[1] Federal regulators require banks and credit unions to use an overdraft opt-in form substantially similar to the model Form A 9 overdraft opt-in for ATM and one-time debit card transactions attached hereto as Ex. A. 12 C.F.R. § 1005.17(b)(1).

7.     This Court has personal jurisdiction over the Defendant because it resides in, regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from products and/or services provided to persons in this District.

8.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because Defendant resides in this District and a substantial part of the events or omissions giving rise to the claims occurred in this District—where Defendant maintains its headquarters.

## FACTUAL BACKGROUND AND GENERAL ALLEGATIONS

9.     In 2021, the largest financial institutions in America charged customers almost $11 billion in OD Fees. Customers who carried an average balance of less than $350 paid 84 percent of these fees. *Why Poverty Persists in America* (The New York Times, Mar. 9, 2023), https://www.nytimes.com/2023/03/09/magazine/poverty-by-america-matthew-desmond.html.

10.     Because of this, industry leaders like Bank of America, Capital One, Wells Fargo, Alliant, and Ally have made plans to end the assessment of OD Fees or Insufficient Funds Fees ("NSF Fees") entirely. *See* Hugh Son, *Capital One to Drop Overdraft Fees for All Retail Banking Customers*, NBC News (Dec. 1, 2021), https://nbcnews.to/3DKSu2R; Paul R. La Monica, *Wells Fargo Ends Bounced Check Fees*, CNN (Jan. 12, 2022), https://bit.ly/3iTAN9k.

11.     Federal regulators have also taken action. For example, the Consumer Financial Protection Bureau (CFPB) recently fined Regions Bank $191 million, finding that it "acted unfairly and abusively" in violation of the Consumer Financial Protection Act of 2010 by assessing the same "surprise" APSN fees at issue here. CFPB, Enforcement Actions, Regions Bank (Sep. 28, 2022), available at: https://www.consumerfinance.gov/enforcement/actions/regions-bank_2022 (last accessed Mar. 22, 2023).

12.     Through the imposition of these fees, Defendant has made substantial revenue to the tune of significant profit, seeking to turn its customers' financial struggles into revenue.

## I.    DEFENDANT ASSESSES OD FEES ON TRANSACTIONS ON DAYS WHEN THE ACCOUNT WAS NOT ACTUALLY OVERDRAWN

### A.  The Contract

13.     Plaintiff has had a checking account with Defendant, which was governed by the Contract, at all times material hereto.

14.     Upon information and belief, the Contract states that overdrafts occur "when you do not have enough money in your account to cover a transaction, but we pay it anyway." Ex. A.

15.     In breach of this promise, Defendant assesses $38.00 OD Fees on days when there is "enough money" in the account "to cover" or "pay" the "transaction" as demonstrated by Defendant's own bank statements.

### B.  Plaintiff's Transactions

16.     On or around March 24, 2022, Defendant charged Plaintiff a $38.00 OD Fee on a transaction made by Plaintiff, even though, according to Defendant's own account statements, the balance in the account was positive on this date.

## II.    DEFENDANT ASSESSES OD FEES ON DEBIT CARD TRANSACTIONS THAT WERE AUTHORIZED ON SUFFICIENT FUNDS

### A.  Overview of the Claim

17.     Plaintiff brings this action challenging Defendant's practice of charging $38.00 OD Fees on what are referred to in this Complaint as "Authorize Positive, Settle Negative Transactions," or "APSN Transactions."

18.     Defendant's practice is as follows: the moment debit card transactions are authorized on an account with positive funds to cover the transaction, Defendant immediately reduces consumers' checking accounts for the amount of the purchase, sets aside funds in the

checking account to cover that transaction, and adjusts the consumer's displayed "available balance" to reflect that subtracted amount. As a result, customers' accounts will always have sufficient funds available to cover these transactions because Defendant has already held the funds for payment.

19.     However, Defendant still assesses crippling $38.00 OD Fees on many of these transactions and misrepresents its practices in the account documents.

20.     Despite putting aside sufficient available funds for debit card transactions at the time those transactions are authorized, Defendant later assesses OD Fees on those same transactions when they settle days later into a negative balance. These types of transactions are APSN Transactions.

21.     Defendant maintains a running account balance, tracking funds consumers have for immediate use. This running account balance is adjusted, in real-time, to account for debit card transactions at the precise instance they are made. When a customer makes a purchase with a debit card, Defendant holds the funds needed to pay the transaction, subtracting the dollar amount of the transaction from the customer's available balance. Such funds are not available for any other use by the account holder and are specifically reserved for a given debit card transaction.

22.     Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure that there are enough funds in the account to pay the transaction when it settles:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a 'debit hold.' During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 F.R. 5498 (Jan. 29, 2009).

23.     That means when any subsequent, intervening transactions are initiated on a checking account, they are compared against an account balance that has already been reduced to account for pending debit card transactions. Therefore, many subsequent transactions incur OD Fees due to the unavailability of the funds held for earlier debit card transactions.

24.     Still, despite always reserving sufficient available funds to cover the transactions and keeping the held funds off-limits for other transactions, Defendant improperly charges OD Fees on APSN Transactions.

25.     The Consumer Financial Protection Bureau ("CFPB") has expressed concern this very issue, flatly calling the practice "unfair" and/or "deceptive" when:

> [A] financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive.
>
> At one or more institutions, examiners found deceptive practices relating to the disclosure of overdraft processing logic for electronic transactions. Examiners noted that these disclosures created a misimpression that the institutions would not charge an overdraft fee with respect to an electronic transaction if the authorization of the transaction did not push the customer's available balance into overdraft status. But the institutions assessed overdraft fees for electronic transactions in a manner inconsistent with the overall net impression created by the disclosures. Examiners therefore concluded that the disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive. Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression

created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing the fees under these circumstances was found to be unfair.

Consumer Financial Protection Bureau, "Supervisory Highlights" (Winter 2015).

26.    The CFPB again criticized the assessment of OD Fees on APSN Transactions in its

October 2022 circular, stating:

Even if a consumer closely monitors their account balances and carefully calibrates their spending in accordance with the balances shown, they can easily incur an overdraft fee they could not reasonably anticipate because financial institutions use processes that are unintelligible for many consumers and that consumers cannot control . . .

For example, even when the available balance on a consumer's account—that is, the balance that, at the time the consumer initiates the transaction, would be displayed as available to the consumer—is sufficient to cover a debit card transaction at the time the consumer initiates it, the balance on the account may not be sufficient to cover it at the time the debit settles. The account balance that is not reduced by any holds from pending transactions is often referred to as the ledger balance. The available balance is generally the ledger balance plus any deposits that have not yet cleared but are made available, less any pending (i.e., authorized but not yet settled) debits. Since consumers can easily access their available balance via mobile application, online, at an ATM, or by phone, they reasonably may not expect to incur an overdraft fee on a debit card transaction when their balance showed there were sufficient available funds in the account to pay the transaction at the time they initiated it. Such transactions, which industry commonly calls "authorize positive, settle negative" or APSN transactions, thus can give rise to unanticipated overdraft fees.
. . .
Charging an unanticipated overdraft fee may generally be an unfair act or practice. Overdraft fees inflict a substantial injury on consumers. Such fees can be as high as $36; thus consumers suffer a clear monetary injury when they are charged an unexpected overdraft fee. Depending on the circumstances of the fee, such as when intervening transactions settle against the account or how the financial institution orders the transactions at the end of the banking day, consumers could be assessed more than one such fee, further exacerbating the injury. These overdraft fees are particularly harmful for consumers, as consumers likely cannot reasonably anticipate them and thus plan for them.

*Consumer Financial Protection Circular 2022-06: Unanticipated Overdraft Fee Assessment*

*Practices*, Consumer Financial Protection Bureau 5-6 (Oct. 26, 2022), https://bit.ly/3SNPg69.

27.    There is no justification for these practices, other than to maximize Defendant's OD Fee revenue. APSN Transactions only exist because intervening transactions supposedly reduce an account balance. But Defendant is free to protect its interests and either reject those intervening transactions or charge OD Fees on those intervening transactions— and it does the latter to the tune of significant profit each year.

28.    But Defendant was not content with these millions in OD Fees. Instead, it sought millions more in OD Fees on APSN Transactions.

29.    Besides being deceptive, these practices breach contract promises made in Defendant's adhesion contracts, which fundamentally misconstrue and mislead consumers about the true nature of Defendant's processes and practices. Defendant also exploits its contractual discretion by implementing these practices to gouge its customers.

**B.  Mechanics of a Debit Card Transaction**

30.    A debit card transaction occurs in two parts. First, authorization for the purchase amount is instantaneously obtained by the merchant from Defendant. When a customer physically or virtually "swipes" their debit card, the credit card terminal connects via an intermediary, to Defendant, which verifies that the customer's account is valid and that sufficient available funds exist to cover the transaction amount.

31.    At this step, if the transaction is approved, Defendant immediately decrements the funds in a consumer's account and holds funds in the amount of the transaction but does not yet transfer the funds to the merchant.

32.    Sometime thereafter, the funds are actually transferred from the customer's account to the merchant's account.

33.     Defendant (like all banks and credit unions) decides whether to "pay" debit card transactions at authorization. For debit card transactions, that moment of decision can only occur at the point of sale, when the transaction is authorized or declined. It is at that point—and only that point—that Defendant may choose to either pay the transaction or to decline it. When the time comes to actually transfer funds for the transaction to the merchant, it is too late for the bank to deny payment—the bank has no discretion and must pay the charge. This "must pay" rule applies industry wide and requires that, once a financial institution authorizes a debit card transaction, it "must pay" when the merchant later makes a demand, regardless of other account activity. *See* Electronic Fund Transfers, 74 Fed. Reg. 59033-01, 59046 (Nov. 17, 2009).

34.     There is no change—no impact whatsoever—to the available funds in an account when the transfer step occurs.

**C. Defendant's Contract**

35.     Plaintiff has had a checking account with Defendant, which was governed by the Contract at all times material hereto. *See* Exs. A - B.

36.     Upon information and belief, the Contract states that, "[a]n overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway." Ex. A (emphasis in original).

37.     In breach of this promise, Defendant assesses $38.00 OD Fees when there is "enough money" in the account to "cover" or "pay" the transaction.

38.     Upon information and belief, Defendant also promises that authorization and payment of a debit card transaction occur simultaneously and that overdrafts will be determined at the time a transaction is "authorized and paid":

We do ***authorize and pay*** overdrafts for the following types of transactions:

- Checks and other transactions made using your checking account number
- Automatic bill payments.

We do not ***authorize and pay*** overdrafts for the following types of transactions unless you ask us to (see below):
- ATM transactions
- Everyday debit card transactions.

We pay overdrafts at our discretion, which means we do not guarantee that we will always ***authorize and pay*** any type of transaction.

If we do not ***authorize and pay*** an overdraft, your transaction will be declined.

…

What if I want [Institution Name] to ***authorize and pay*** overdrafts on my ATM and everyday debit card transactions?

If you also want us to ***authorize and pay*** overdrafts on ATM and everyday debit card transactions, call…

…

--------------------------------------------------------------------------------------------------
___ I do not want [Institution Name] to ***authorize and pay*** overdrafts on my ATM and everyday debit card transactions.

___ I want [Institution Name] to ***authorize and pay*** overdrafts on my ATM and everyday debit card transactions.

Ex. A (emphasis added, removed from original).

39.     These promises link payment to authorization ***eight times*** in the account documents, meaning that transactions are paid, and therefore overdrafts are determined, at authorization of a debit card transaction.

40.     For APSN Transactions, which are immediately deducted from a positive account balance and held aside for payment of that same transaction, there is always enough money to cover the transaction – yet Defendant assesses OD Fees on them anyway.

41.    The above promises indicate that transactions are only overdraft transactions when there is not enough money to cover the transaction at the time the customer swipes his or her debit card to pay for an item. Of course, that is not true for APSN Transactions.

42.    In fact, Defendant actually authorizes transactions on positive funds, sets those funds aside on hold, then fails to use those same funds to post those same transactions. Instead, it uses a secret posting process described below.

43.    All of the above representations and contractual promises are untrue. Defendant charges fees even when sufficient funds exist to cover transactions that are authorized into a positive balance. No express language in any document states that Defendant may impose fees on any APSN Transactions.

44.    The Contract also misconstrues Defendant's true debit card processing and overdraft practices.

45.    First, and most fundamentally, Defendant charges OD Fees on debit card transactions for which there are sufficient funds available to cover throughout their lifecycle.

46.    Defendant's practice of charging OD Fees even when sufficient available funds exist to cover a transaction violates its contractual promise not to do. This discrepancy between Defendant's actual practice and the Contract causes consumers like Plaintiff to incur more OD Fees than they should.

47.    Next, sufficient funds for APSN Transactions are actually debited from the account immediately, consistent with standard industry practice.

48.    Because these withdrawals take place upon initiation, the funds cannot be re-debited later. But that is what Defendant does when it re-debits the account during a secret batch posting process.

49.     Defendant's actual practice is to assay the same debit card transaction twice to determine if it overdraws an account—both at the time a transaction of authorization and later at the time of settlement.

50.     At the time of settlement, however, an available balance does not change at all for these transactions previously authorized into positive funds. As such, Defendant cannot then charge an OD Fee on that transaction because the available balance has not been rendered insufficient due to the pseudo-event of settlement.

51.     Upon information and belief, something more is going on: at the moment a debit card transaction is getting ready to settle, Defendant releases the hold placed on funds for the transaction for a split second, putting money back into the account, then re-debits the same transaction a second time.

52.     This secret step allows Defendant to charge OD Fees on transactions that never should have gotten them—transactions that were authorized into sufficient funds, and for which Defendant specifically set aside money to pay.

53.     In sum, there is a huge gap between Defendant's practices as described in the Contract and Defendant's actual practices.

54.     Banks and credit unions like Defendant that employ this abusive practice require their accountholders to expressly agree to it—something Defendant here never did.

55.     Indeed, recognizing the complexity of the settlement process for APSN Transactions and the fact that a fee in such circumstances is counterintuitive to accountholders, other banks and credit unions require their accountholders to agree to be assessed OD Fees on APSN Transactions.

56.    Defendant and its accountholders make no such agreement. The Contract thus misleads and deceives accountholders.

**D. Reasonable Consumers Understand Debit Card Transactions are Debited Immediately**

57.    Defendant's assessment of OD Fees on transactions that have not overdrawn an account is inconsistent with immediate withdrawal of funds for debit card transactions. This is because if funds are immediately debited, they cannot be depleted by intervening, subsequent transactions. If funds are immediately debited, they are necessarily applied to the debit card transactions for which they are debited.

58.    Defendant was and is aware that this precisely how its accountholders reasonably understand debit card transactions work.

59.    Defendant knows that consumers prefer debit cards for these very reasons. Consumer research shows that consumers prefer debit cards as budgeting devices because they don't allow debt like credit cards as the money comes directly out of the checking account.

60.    Consumer Action, a national nonprofit consumer education and advocacy organization, advises consumers determining whether they should use a debit card that "[t]here is no grace period on debit card purchases the way there is on credit card purchases; the money is immediately deducted from your checking account. Also, when you use a debit card you lose the one or two days of 'float' time that a check usually takes to clear." *What Do I Need To Know About Using A Debit Card?*, Consumer Action (Jan. 14, 2019), https://bit.ly/3v5YL62.

61.    This understanding is a large part of the reason that debit cards have risen in popularity. The number of terminals that accept debit cards in the United States has increased by approximately 1.4 million in the last five years, and with that increasing ubiquity, consumers have viewed debit cards (along with credit cards) "as a more convenient option than refilling their

wallets with cash from an ATM." Maria LaMagna, *Debit Cards Gaining on Case for Smallest Purchases*, MarketWatch (Mar. 23, 2016), https://on.mktw.net/3kV2zCH.

62.     Not only have consumers increasingly substituted debit cards for cash, but they believe that a debit card purchase is the functional equivalent to a cash purchase, with the swipe of a card equating to handing over cash, permanently and irreversibly.

63.     Accordingly, "[o]ne of the most salient themes [in complaints to the CFPB] . . . is the difficulty avoiding overdrafts even when consumers believed they would. Often, this was related to bank practices that make it difficult for consumers to know balance availability, transaction timing, or whether or not overdraft transactions would be paid or declined." Rebecca Borne et al., *Broken Banking: How OD Fees Harm Consumers and Discourage Responsible Bank Products*, Center for Responsible Lending 8 (May 2016), https://bit.ly/3v7svL1.

64.     In fact, consumers' leading complaints involved extensive confusion over the available balance and the time of posting debits and credits:



Figure 3: Top Overdraft Consumer Complaint Issues, by Percentage of Total Complaints

*Id.*

65.    Consumers are particularly confused by financial institutions' fee practices when "based on their actual review of their available balance, often including any 'pending' transactions, [customers] believed funds were available for transactions they made, but they later learned the transactions had triggered overdraft fees." *Id*. at 9

66.    Ultimately, unclear and misleading fee representations like those in Defendant's account documents mean that consumers like Plaintiff "who are carefully trying to avoid overdraft, and often believe they will avoid it . . . end up being hit by fees nonetheless." *Id*.

67.    The Federal Deposit Insurance Corporation ("FDIC") has specifically noted that financial institutions may effectively mitigate this wide-spread confusion regarding overdraft practices by "ensuring that any transaction authorized against a positive available balance does not incur an overdraft fee, even if the transaction later settles against a negative available balance." *Consumer Compliance Supervisory Highlights*, FDIC 3 (June 2019), https://bit.ly/3t2ybsY.

68.    Despite this recommendation, Defendant continues to assess OD Fees on transactions that are authorized on sufficient funds.

69.    Defendant was aware of the consumer perception that debit card transactions reduce an account balance at a specified time—namely, the time and order the transactions are actually initiated—and the Contract only creates confusion for its accountholders.

70.    Defendant was also aware of consumers' confusion regarding OD Fees but nevertheless failed to make its accountholders agree to these practices.

### E. Plaintiff Was Assessed OD Fees on Debit Card Transactions Previously Authorized on Sufficient Funds

71.    On or around April 28, 2022 and April 29, 2022, Plaintiff was assessed a $38.00 OD Fee on a debit card transaction, even though the transaction had been previously authorized on sufficient funds.

72.     Because Defendant had previously held the funds to cover these transactions, Plaintiff's account always had sufficient funds to cover these transactions and should not have been assessed these fees.

## III.    DEFENDANT CHARGES FEES ON FEES THAT ARE NOT CONSUMER-INITIATED TRANSACTIONS OR ITEMS.

### A.    Overview of the Claim

73.     Plaintiff brings this claim challenging Defendant's practice of charging $38.00 fees on a third-party merchant's attempt to collect its own fee.

74.     A third-party merchant may impose its own fee on a customer's account for a variety of reasons.

75.     This fee from the merchant is not a new transaction or item initiated by the customer. Rather, it is simply a service charge unilaterally assessed by the merchant.

76.     Nevertheless, when the third-party merchant requests payment of its fee, Defendant treats the merchant's fee as a new transaction or item subject to a $38.00 fee from Defendant.

77.     This is despite the fact that consumers never actually perform a separate consumer-initiated item or transaction and instead are being charged fees by third-party merchants.

### B.    The Contract

78.     Plaintiff has had a checking account with Defendant, which was governed by the Contract at all times material hereto. *See* Exs. A - B.

79.     Upon information and belief, Defendant promises in its Contract that, "[a]n overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway." Ex. A (emphasis in original).

16

80.    In its common usage, a transaction is "a completed agreement between a buyer and a seller to exchange goods, services, or financial assets in return for money." Transaction, Investopedia, https://tinyurl.com/5fn7jr7r (last visited Dec. 4, 2024).

81.    No "overdraft occurs" on a third-party merchant's attempt to collect a fee because no *exchange* of goods, services or financial assets occurs when a third-party merchant unilaterally assesses its own fee.

82.    In addition, the third-party merchant's attempt to collect its fee is not a consumer-initiated transaction – it is just a third-party's attempt to collect its own fee.

83.    Defendant breached its contractual promises when it charged fees in these circumstances.

**C.  Plaintiff's Experience**

84.    As an example, on March 25, 2022, a third-party financial institution attempted to collect its own $2.00 fee from Plaintiff's account.

85.    Defendant paid the third-party financial institution's fee attempt into overdraft and charged Plaintiff a $38.00 fee for doing so.

86.    No provision of the Contract permits Defendant to assess fees on top of a third-party merchant's attempt to assess a fee.

87.    Plaintiff understood that he would not be subject to a $38.00 fee on an attempt by a third-party financial institution to collect its own fee. In other words, Plaintiff reasonably expected to only be assessed such fees on consumer-initiated transactions that overdraw his account.

**IV.    PLAINTIFF NEVER AGREED TO BE ASSESSED MULTIPLE FEES ON AN ITEM THAT THE CONSUMER ONLY PRESENTED FOR PAYMENT ONCE**

88.    Defendant unlawfully maximizes its already profitable fees through its deceptive and contractually-prohibited practice of charging multiple NSF Fees, or an NSF Fee followed by an Overdraft Fee, on an item that the consumer only presented for payment once.

89.    In 2023, the CFPB has stated that:

> The assessment of multiple NSF fees for the same transaction caused substantial monetary harm to consumers, totaling millions of dollars. These injuries were not reasonably avoidable by consumers, regardless of account opening disclosures. And the injuries were not outweighed by countervailing benefits to consumers or competition.

Consumer Fin. Protection Bureau, Issue 29, Winter 2023, Supervisory Highlights Junk Fees Special Edition, *available at* https://www.consumerfinance.gov/data-research/research-reports/supervisory-highlights-junk-fees-special-edition-issue-29-winter-2023/.

90.    The Federal Deposit Insurance Corporation (the "FDIC") has expressed concern with the practice of assessing multiple fees on an item. In 2012, the FDIC determined that one bank's assessment of more than one NSF Fee on the same item was a "deceptive and unfair act." *In the Matter of Higher One, Inc., Consent Order*, Consent Order, FDIC-1 1-700b, FDIC-1 1-704k, 2012 WL 7186313.

91.    The FDIC also recently recommended that the multiple fee practice be halted entirely. *See* Barbarino, Al. "FDIC Warns Banks About Risks of Bounced Check Fees." Law360, Aug. 19, 2022, *available at* https://www.law360.com/articles/1522501/fdic-warns-banks-about-risks-tied-to-bounced-check-fees.

92.    And, in the FDIC's Mar. 2022 Consumer Compliance Supervisory Highlights, the FDIC again addressed the charging of multiple non-sufficient funds fees for transactions presented multiple times against insufficient funds in the customer's account. *See FDIC Consumer Compliance Supervisory Highlights, Mar. 2022, available at*

https://www.fdic/gov/news/financial-institution-letters/2022/fil22014.html. FDIC examiners have scrutinized this issue in recent exams, with some exams remaining open pending resolution of the issue.

93.    However, Defendant engages in this abusive and deceptive practice against the reasonable expectations of its customers.

94.    The Contract allows Defendant to take certain steps when paying a check other item when the accountholder does not have sufficient funds to cover it. Specifically, Defendant may (a) pay the item and charge a $38.00 fee; or (b) reject the item and charge a $38.00 fee.

95.    In contrast to the Contract, however, Defendant regularly assesses two or more $38.00 fees on an item that the consumer only presented for payment once.

**A.  The Imposition of Multiple Fees on an Item That the Consumer Only Presented for Payment Once Violates Defendant's Express Promises and Representations**

96.    Plaintiff has had a checking account with Defendant, which was governed by the Contract at all times material hereto. *See* Exs. A - B.

97.    Defendant's Fee Schedule promises to charge an "Overdraft Item Fee" of $38.00 *or* an "Insufficient Funds (NSF) Item Fee" of $38.00 "each time an item is presented" for payment by the consumer:

| | |
|---|---|
| Insufficient Funds (NSF) Item Fee | $38.00[3] |
| Official Checks | $5.00 |
| Overdraft Item Fee | $38.00[4] |

...

3 - Each time an item is presented and returned unpaid due to non-sufficient funds (NSF)
4 - Each time an item is presented and paid in the overdraft.

98.     In breach of these promises, Defendant assesses multiple $38.00 "Insufficient Funds (NSF) Item" fees per item, or a $38.00 "Insufficient Funds (NSF) Item" fee followed by a $38.00 "Overdraft Item" fee per item when the consumer only presented for payment once.

99.     This means that an "item" can be subject to up to $114.00 in charges per transaction that the consumer only presented for payment once.

100.    The same "item" on an account cannot conceivably become a new one each time it is rejected for payment then reprocessed, especially when – as here – Plaintiff took no action to resubmit it.

101.    Reasonable consumers understand any given authorization for payment to be one, singular "item" eligible for a single charge, as that term is used in the Contract, when the item is presented for payment by the consumer only once.

102.    Defendant and its customers never agreed that Defendant could assess multiple fees for a single check or other item with the consumer has presented the item for payment once.

103.    The Contract provides no such authorization, an actually promises the opposite – Defendant may charge at most, a fee on an item that the consumer has only presented for payment once.

104.    As such, Defendant breached its Contract when it charged more than one fee per item that the consumer only presented for payment once.

**B.  Plaintiff's Experience**

105.    In support of Plaintiff's claim, Plaintiff offers examples of fees that should not have been assessed against Plaintiff's checking account. As alleged below, Defendant: (a) reprocessed a previously declined item without instruction from Plaintiff; and (b) charged an additional fee upon reprocessing.

106.    On March 28, 2022, Plaintiff attempted a transaction.

107.    Defendant rejected payment of that item due to insufficient funds in Plaintiff's account and charged Plaintiff a $38.00 fee for doing so.

108.    Unbeknownst to Plaintiff and without Plaintiff's request to Defendant to reprocess the item, on or around April 1, 2022, Defendant processed the same item again, paid the item into overdraft and charged Plaintiff a second $38.00 fee.

109.    *In sum, Defendant charged Plaintiff $76 in fees on an item that Plaintiff only presented for payment once.*

110.    On April 29, 2022, Plaintiff attempted a transaction.

111.    Defendant rejected payment of that item due to insufficient funds in Plaintiff's account and charged Plaintiff a $38.00 fee for doing so.

112.    Unbeknownst to Plaintiff and without Plaintiff's request to Defendant to reprocess the item, on or around May 5, 2022, Defendant processed the same item again, rejected the item again and charged Plaintiff a second $38.00 fee.

113.    *In sum, Defendant charged Plaintiff $76 in fees on an item that Plaintiff only presented for payment once.*

114.    Plaintiff understood these transactions to each be a single item as is laid out in the Contract, capable of receiving, at most, a single fee if Defendant returned it, or a single fee if Defendant paid it so long as Plaintiff did not resubmit the item.

## V.    <u>DEFENDANT ASSESSED OVERDRAFT INTEREST CHARGES ON DAYS THAT THE ACCOUNT WAS NOT OVERDRAWN</u>

### A.  The Contract

115.    Plaintiff has had a checking account with Defendant, which was governed by the Contract at all times material hereto. *See* Exs. A - B.

116.    Upon information and belief, the Contract promises that "[a]n <u>overdraft</u> occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway." Ex. A (emphasis in original).

117.    In breach of this promise, Defendant assesses an Overdraft Interest charge on days that the account is not overdrawn as demonstrated by Defendant's own bank statements.

### B. Plaintiff's Transactions

118.    On or around April 20, 2022, Defendant assessed a $5.44 Overdraft Interest charge on Plaintiff's account, even though, according to Defendant's own account statements, the balance in the account was positive on this date.

## VI.    <u>NONE OF THESE FEES WERE ERRORS</u>

119.    The improper fees charged by Defendant to Plaintiff's account were not errors by Defendant, but rather were intentional charges made by Defendant as part of its standard processing of transactions.

120.    Plaintiff therefore had no duty to report the fees as errors because they were not; instead, they were part of the systematic and intentional assessment of fees according to Defendant's standard practices.

121.    Moreover, any such reporting would have been futile as Defendant's own contract admits that Defendant made a decision to charge the fees.

## VII.    <u>THE IMPOSITION OF FEES IN THIS MANNER BREACHES DEFENDANT'S DUTY OF GOOD FAITH AND FAIR DEALING</u>

122.    Parties to a contract are required not only to adhere to the express conditions of the contract but also to act in good faith when they are invested with a discretionary power over the other party. Further, as to bank transactions, the Uniform Commercial Code ("UCC")—which has been adopted by all states—mandates good faith and fair dealing. As such, when a party such as

Defendant gives itself discretion to act, the party with discretion is required to exercise that power and discretion in good faith. This creates an implied promise to act in accordance with the parties' reasonable expectations and means that Defendant is prohibited from exercising its discretion to enrich itself and gouge its customers. Indeed, Defendant has a duty to honor transaction requests in a way that is fair to Plaintiff and its other customers and is prohibited from exercising its discretion to pile on ever greater penalties.

123.    Here—in the adhesion agreements Defendant foisted on Plaintiff and its other customers—Defendant has provided itself numerous discretionary powers affecting customers' accounts. But instead of exercising that discretion in good faith and consistent with consumers' reasonable expectations, Defendant abuses that discretion to take money out of consumers' accounts without their permission and contrary to their reasonable expectations that they will not be charged these fees.

124.    Defendant exercises its discretion in its own favor—and to the prejudice of Plaintiff and its other customers—when it assesses fees in this manner. By always assessing these fees to the prejudice of Plaintiff and other customers, Defendant breaches their reasonable expectations and, in doing so, violates its duty to act in good faith. This is a breach of Defendant's implied covenant to engage in fair dealing and to act in good faith.

125.    Further, Defendant maintains complete discretion not to assess fees at all. Instead, Defendant always charges these fees, including OD Fees on transactions on days that the account is not overdrawn, OD Fees on APSN Transactions, OD Fees on other fees, multiple fees on an item that the consumer only presented for payment once , and Overdraft Interest charges on days when the account balance is not overdrawn. By always exercising its discretion in its own favor—and to

the prejudice of Plaintiff and other customers, Defendant breaches the reasonable expectations of Plaintiff and other customers and, in doing so, violates its duty to act in good faith.

126.    It was bad faith and totally outside Plaintiff's reasonable expectations for Defendant to use its discretion in this way.

127.    When Defendant charges improper fees in this way, Defendant uses its discretion to interpret the meaning of key terms in an unreasonable way that violates common sense and reasonable consumers' expectations. Defendant uses its contractual discretion to set the meaning of those terms to choose a meaning that directly causes more Overdraft fees.

## CLASS ALLEGATIONS

128.    Plaintiff brings this action on behalf of himself and all others similarly situated pursuant to Rule 23. This action satisfies the numerosity, typicality, adequacy, predominance, and superiority requirements of Rule 23.

129.    The proposed Classes are defined as:

**The Account Balance Class:** All Defendant checking account holders who, during the applicable statute of limitations, were charged Overdraft Fees on transactions on days when the account was not overdrawn.

**The APSN Class**: All Defendant checking account holders who, during the applicable statute of limitations, were assessed an overdraft fee on a debit card transaction that was authorized on sufficient funds and settled on negative funds in the same amount for which the debit card transaction was authorized.

**The Fee-on-Fee Class**: All Defendant checking account holders who, during the applicable statute of limitations, were assessed an overdraft fee or an insufficient funds fee on a third-party merchant's attempt to collect its own fee.

**The Multiple Fee Class**: All Defendant checking account holders who, during the application statute of limitations, were assessed multiple fees on an item that the consumer only presented for payment once.

> **The Overdraft Interest Charge Class**: All Defendant checking account holders who, during the applicable statute of limitations, were assessed an Overdraft Interest Charge on days when the account was not overdrawn.

130.    Plaintiff reserves the right to modify or amend the definition of the proposed Classes before the Court determines whether certification is appropriate.

131.    Excluded from the Classes are Defendant, its parents, subsidiaries, affiliates, officers, directors, legal representatives, successors, and assigns; any entity in which Defendant has a controlling interest; all customers who make a timely election to be excluded; governmental entities; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

132.    The members of the Classes are so numerous that joinder is impractical. The Classes consist of thousands of members, the identities of whom are within the exclusive knowledge of Defendant and can be ascertained only by resort to Defendant's records.

133.    Plaintiff's claims are typical of the claims of the Classes in that Plaintiff, like all members of the Classes, was charged improper fees. Plaintiff, like all members of the Classes, has been damaged by Defendant's misconduct in that they have been assessed unlawful fees. Furthermore, the factual basis of Defendant's misconduct is common to all members of the Classes and represents a common thread of deceptive and unlawful conduct resulting in injury to all members of the Classes. Plaintiff has suffered the harm alleged and have no interests antagonistic to the interests of any other members of the Classes.

134.    The questions in this action are ones of common or general interest such that there is a well-defined community of interest among the members of the Classes. These questions predominate over questions that may affect only individual class members because Defendant has acted on grounds generally applicable to the Classes.

135.    Among the questions of law and fact common to the Classes include:

a.    Whether Defendant charged OD Fees on days when the account balance was not overdrawn;

b.    Whether Defendant charged OD Fees on APSN Transactions;

c.    Whether Defendant charged OD Fees on a third-party merchant's attempt to collect its own fee;

d.    Whether Defendant charged multiple fees on an item that the consumer only presented for payment once;

e.    Whether Defendant charged Overdraft Interest Charges on days when the account was not overdrawn;

f.    Whether these fee practices breached the Contract and Defendant's duty of good faith and fair dealing;

g.    Whether Defendant was unjustly enriched by its fee assessment practices;

h.    The proper method or methods by which to measure damages; and

i.    The declaratory and injunctive relief to which the Classes are entitled.

136.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the amount of each individual Class member's claim is small relative to the complexity of the litigation, no Class member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the members of the Class will continue to suffer losses and Defendant's misconduct will proceed without remedy.

137.    Even if Class members themselves could afford such individual litigation, the court system could not. Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows for the consideration of claims which might otherwise go unheard because of the relative expense of bringing individual lawsuits,

and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

138.    Plaintiff is committed to the vigorous prosecution of this action and have retained competent counsel experienced in the prosecution of class actions, particularly on behalf of consumers and against financial institutions. Accordingly, Plaintiff is an adequate representative and will fairly and adequately protect the interests of the Classes.

139.    Plaintiff suffers a substantial risk of repeated injury in the future. Plaintiff, like all members of the Class, is at risk of additional improper fees. Plaintiff and the Classes are entitled to injunctive and declaratory relief as a result of the conduct complained of herein. Money damages alone could not afford adequate and complete relief, and injunctive relief is necessary to restrain Defendant from continuing to commit its illegal actions.

**CAUSE OF ACTION ONE**
**Breach of Contract, Including Breach of the Covenant of Good Faith and Fair Dealing**
**(On Behalf of Plaintiff and the Account Balance Class)**

140.    Plaintiff realleges and incorporates by reference all the foregoing allegations as if they were fully set forth herein.

141.    Plaintiff and Defendant have contracted for bank account services, as embodied in the Contract. *See* Exs. A - B.

142.    All contracts entered by Plaintiff and the Account Balance Class are identical or substantively identical because Defendant's form contracts were used uniformly.

143.    Defendant has breached the express terms of its own agreements as described herein.

144.    Under Mississippi law, good faith is an element of every contract between financial institutions and their customers because banks and credit unions are inherently in a superior

position to their checking account holders and, from this superior vantage point, they offer customers contracts of adhesion, often with terms not readily discernible to a layperson.

145.    Good faith and fair dealing means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

146.    Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. Examples of bad faith are evasion of the spirit of the bargain and abuse of a power to specify terms.

147.    Defendant abused the discretion it granted to itself when it charged OD Fees on transactions on days when the account is not overdrawn.

148.    Defendant also abused the discretion it granted to itself by defining key terms in a manner that is contrary to reasonable account holders' expectations.

149.    In these and other ways, Defendant violated its duty of good faith and fair dealing.

150.    Defendant willfully engaged in the foregoing conduct for the purpose of (1) gaining unwarranted contractual and legal advantages; and (2) unfairly and unconscionably maximizing fee revenue from Plaintiff and other members of the Account Balance Class.

151.    Plaintiff and members of the Account Balance Class have performed all, or substantially all, of the obligations imposed on them under the Contract.

152.    Plaintiff and members of the Account Balance Class have sustained damages as a result of Defendant's breaches of contract, including breaches of contract through violations of the covenant of good faith and fair dealing.

153.    Plaintiff and the members of the Account Balance Class are entitled to injunctive relief to prevent Defendant from continuing to engage in fee practices that violate the parties' Contract.

## CAUSE OF ACTION TWO
### Breach of Contract, Including Breach of the Covenant of Good Faith and Fair Dealing
### (On Behalf of Plaintiff and the APSN Class)

154.    Plaintiff realleges and incorporates by reference all the foregoing allegations as if they were fully set forth herein.

155.    Plaintiff and Defendant have contracted for bank account services, as embodied in the Contract. *See* Exs. A - B.

156.    All contracts entered by Plaintiff and the APSN Class are identical or substantively identical because Defendant's form contracts were used uniformly.

157.    Defendant has breached the express terms of its own agreements as described herein.

158.    Under Mississippi law, good faith is an element of every contract between financial institutions and their customers because banks and credit unions are inherently in a superior position to their checking account holders and, from this superior vantage point, they offer customers contracts of adhesion, often with terms not readily discernible to a layperson.

159.    Good faith and fair dealing means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

160.    Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of

inaction, and fair dealing may require more than honesty. Examples of bad faith are evasion of the spirit of the bargain and abuse of a power to specify terms.

161.    Defendant abused the discretion it granted to itself when it charged OD Fees on APSN Transactions.

162.    Defendant also abused the discretion it granted to itself by defining key terms in a manner that is contrary to reasonable account holders' expectations.

163.    In these and other ways, Defendant violated its duty of good faith and fair dealing.

164.    Defendant willfully engaged in the foregoing conduct for the purpose of (1) gaining unwarranted contractual and legal advantages; and (2) unfairly and unconscionably maximizing fee revenue from Plaintiff and other members of the APSN Class.

165.    Plaintiff and members of the APSN Class have performed all, or substantially all, of the obligations imposed on them under the Contract.

166.    Plaintiff and members of the APSN Class have sustained damages as a result of Defendant's breaches of contract, including breaches of contract through violations of the covenant of good faith and fair dealing.

167.    Plaintiff and the members of the APSN Class are entitled to injunctive relief to prevent Defendant from continuing to engage in fee practices that violate the parties' Contract.

<u>**CAUSE OF ACTION THREE**</u>
**Breach of Contract, Including Breach of the Covenant of Good Faith and Fair Dealing**
**(On Behalf of Plaintiff and the Fee-On-Fee Class)**

168.    Plaintiff realleges and incorporates by reference all the foregoing allegations as if they were fully set forth herein.

169.    Plaintiff and Defendant have contracted for bank account services, as embodied in the Contract. *See* Exs. A - B.

170.    All contracts entered by Plaintiff and the Fee-On-Fee Class are identical or substantively identical because Defendant's form contracts were used uniformly.

171.    Defendant has breached the express terms of its own agreements as described herein.

172.    Under Mississippi law, good faith is an element of every contract between financial institutions and their customers because banks and credit unions are inherently in a superior position to their checking account holders and, from this superior vantage point, they offer customers contracts of adhesion, often with terms not readily discernible to a layperson.

173.    Good faith and fair dealing means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

174.    Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. Examples of bad faith are evasion of the spirit of the bargain and abuse of a power to specify terms.

175.    Defendant abused the discretion it granted to itself when it charged OD Fees on a third-party merchant's attempt to collect its own fee.

176.    Defendant also abused the discretion it granted to itself by defining key terms in a manner that is contrary to reasonable account holders' expectations.

177.    In these and other ways, Defendant violated its duty of good faith and fair dealing.

178.    Defendant willfully engaged in the foregoing conduct for the purpose of (1) gaining unwarranted contractual and legal advantages; and (2) unfairly and unconscionably maximizing fee revenue from Plaintiff and other members of the Fee-On-Fee Class.

179.    Plaintiff and members of the Fee-On-Fee Class have performed all, or substantially all, of the obligations imposed on them under the Contract.

180.    Plaintiff and members of the Fee-On-Fee Class have sustained damages as a result of Defendant's breaches of contract, including breaches of contract through violations of the covenant of good faith and fair dealing.

181.    Plaintiff and the members of the Fee-On-Fee Class are entitled to injunctive relief to prevent Defendant from continuing to engage in fee practices that violate the parties' Contract.

## CAUSE OF ACTION FOUR
### Breach of Contract, Including Breach of the Covenant of Good Faith and Fair Dealing
### (On Behalf of Plaintiff and the Multiple Fee Class)

182.    Plaintiff realleges and incorporates by reference all the foregoing allegations as if they were fully set forth herein.

183.    Plaintiff and Defendant have contracted for bank account services, as embodied in the Contract. *See* Exs. A - B.

184.    All contracts entered by Plaintiff and the Multiple Fee Class are identical or substantively identical because Defendant's form contracts were used uniformly.

185.    Defendant has breached the express terms of its own agreements as described herein.

186.    Under Mississippi law, good faith is an element of every contract between financial institutions and their customers because banks and credit unions are inherently in a superior

position to their checking account holders and, from this superior vantage point, they offer customers contracts of adhesion, often with terms not readily discernible to a layperson.

187.    Good faith and fair dealing means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

188.    Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. Examples of bad faith are evasion of the spirit of the bargain and abuse of a power to specify terms.

189.    Defendant abused the discretion it granted to itself when it charged multiple fees on an item that the consumer only presented for payment once.

190.    Defendant also abused the discretion it granted to itself by defining key terms in a manner that is contrary to reasonable account holders' expectations.

191.    In these and other ways, Defendant violated its duty of good faith and fair dealing.

192.    Defendant willfully engaged in the foregoing conduct for the purpose of (1) gaining unwarranted contractual and legal advantages; and (2) unfairly and unconscionably maximizing fee revenue from Plaintiff and other members of the Multiple Fee Class.

193.    Plaintiff and members of the Multiple Fee Class have performed all, or substantially all, of the obligations imposed on them under the Contract.

194.    Plaintiff and members of the Multiple Fee Class have sustained damages as a result of Defendant's breaches of contract, including breaches of contract through violations of the covenant of good faith and fair dealing.

195.    Plaintiff and the members of the Multiple Fee Class are entitled to injunctive relief to prevent Defendant from continuing to engage in fee practices that violate the parties' Contract.

## CAUSE OF ACTION FIVE
### Breach of Contract, Including Breach of the Covenant of Good Faith and Fair Dealing
### (On Behalf of Plaintiff and the Overdraft Interest Charge Class)

196.    Plaintiff realleges and incorporates by reference all the foregoing allegations as if they were fully set forth herein.

197.    Plaintiff and Defendant have contracted for bank account services, as embodied in the Contract. *See* Exs. A - B.

198.    All contracts entered by Plaintiff and the Overdraft Interest Charge Class are identical or substantively identical because Defendant's form contracts were used uniformly.

199.    Defendant has breached the express terms of its own agreements as described herein.

200.    Under Mississippi law, good faith is an element of every contract between financial institutions and their customers because banks and credit unions are inherently in a superior position to their checking account holders and, from this superior vantage point, they offer customers contracts of adhesion, often with terms not readily discernible to a layperson.

201.    Good faith and fair dealing means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

202.    Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of

34

inaction, and fair dealing may require more than honesty. Examples of bad faith are evasion of the spirit of the bargain and abuse of a power to specify terms.

203.    Defendant abused the discretion it granted to itself when it charged Overdraft Interest Charges on days when the account was not overdrawn.

204.    Defendant also abused the discretion it granted to itself by defining key terms in a manner that is contrary to reasonable account holders' expectations.

205.    In these and other ways, Defendant violated its duty of good faith and fair dealing.

206.    Defendant willfully engaged in the foregoing conduct for the purpose of (1) gaining unwarranted contractual and legal advantages; and (2) unfairly and unconscionably maximizing fee revenue from Plaintiff and other members of the Overdraft Interest Charge Class.

207.    Plaintiff and members of the Overdraft Interest Charge Class have performed all, or substantially all, of the obligations imposed on them under the Contract.

208.    Plaintiff and members of the Overdraft Interest Charge Class have sustained damages as a result of Defendant's breaches of contract, including breaches of contract through violations of the covenant of good faith and fair dealing.

209.    Plaintiff and the members of the Overdraft Interest Charge Class are entitled to injunctive relief to prevent Defendant from continuing to engage in fee practices that violate the parties' Contract.

**CAUSE OF ACTION SIX**
**Unjust Enrichment**
**(on behalf of Plaintiff and the Classes)**

210.    Plaintiff realleges and incorporates the preceding paragraphs of this Complaint as if fully set forth herein.

211.    Plaintiff, individually and on behalf of the Classes, asserts a common law claim for unjust enrichment. This claim is brought solely in the alternative to Plaintiff's breach of contract claims and applies only if the parties' contracts are deemed unconscionable or otherwise unenforceable for any reason. In such circumstances, unjust enrichment will dictate that Defendant disgorge all improperly assessed fees.

212.    Defendant has knowingly accepted and retained a benefit in the form of improper fees to the detriment of Plaintiff and the members of the Classes, who reasonably expect to be compensated for their injury.

213.    Defendant has retained this benefit through its fee maximization scheme, and such retention violates fundamental principles of justice, equity, and good conscience.

214.    Defendant should not be allowed to profit or enrich itself inequitably and unjustly at the expense of Plaintiff and the members of the Classes and should be required to make restitution to Plaintiff and the members of the Classes.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Classes, respectfully requests that the Court:

    a.   Certify this case as a class action, designating Plaintiff as the Class Representatives and designating the undersigned as Class Counsel;

    b.   Award Plaintiff and the Classes actual damages in an amount to be proven at trial;

    c.   Award Plaintiff and the Classes restitution in an amount to be proven at trial;

    d.   Award Plaintiff and the Classes pre- and post-judgment interest in the amount permitted by law;

    e.   Award Plaintiff and the Classes attorneys' fees and costs as permitted by law;

f.   Grant Plaintiff and the Classes a trial by jury;

g.   Enjoin Defendant from breaching the Contract;

h.   Declare Defendant's fee policies and practices outlined herein to be unlawful in
     light of its contractual promises;

i.   Grant leave to amend these pleadings to conform to evidence produced at trial; and

j.   Grant such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff, by counsel, demands trial by jury.


Date: February 6, 2025                    Respectfully submitted,

                                          */s/   Winston S. Hudson*
                                          Winston S. Hudson (MS Bar # 106598)
                                          **JENNINGS & EARLEY PLLC**
                                          500 President Clinton Avenue, Suite 110
                                          Little Rock, Arkansas 72201
                                          Phone: 601-270-0197
                                          winston@jefirm.com

                                          *Attorney for Plaintiff and the Putative Classes*

37